Our next case this afternoon is 413-0112. Entering Marriage of Cramm. For the appellant is Donald Shearing, you are he, sir. For the appellee is Donald Heck, you are he. Shearing, you may proceed. Thank you. May it please the court, Mr. Heck. I would first like to address the motion to strike that has been filed directed to the third issue in the appellee's brief in regards to their specific request of relief. We filed a motion to strike stating that the appellee did not file any cross appeal within the 10 days, nor did they file within the 30 days. And there's allegations in that section 3 of their brief discussing certain relief. And that was filed and the court at that time said that that would be taken under advisement and decided along with the appeal. So I can only mention that to the court at this time that in fact is pending and believe that the motion to strike is in fact well taken and would ask that that relief be granted. Well, you don't really need, you know, we're aware of what you've raised. Striking the brief is not really necessary. We're aware of the points you made. Go ahead. Second thing then is the relief that we're requesting as argued in the brief that we filed. First would have to do with the issue of maintenance. And we had filed in the trial court two motions to reduce the amount of maintenance based upon Mr. Cram's income. One was at the time prior to 2012 and then in 2012 in regards to the occupation that Mr. Cram had at that time and currently has being a farmer, there was a reduction in his income because of the crop or lack of crops for that year. So both of those motions were in fact denied. And then the court also granted maintenance in the sum of $3,000 per month. The relief that we had requested in the trial court was that the maintenance based upon Mr. Cram's income should have been an area of about $1,500 per month. And called the court's attention that the evidence that was submitted was from Adam Kester, who was an individual that worked for a company that specialized in advising farmers. And he prepared a comparison from 2006 to 2010. Then also at trial he had 2011 income and did an estimate for 2012. The income that Mr. Cram had came up to approximately $72,000 a year. The calculation is not only based upon what his income was, but also we've added back in the depreciation that was taken. So the court in awarding Mrs. Cram some $36,000 per year in fact resulted in half of Mr. Kevin Cram's net income for those years. $72,000 was an average over the five years plus 2011 and 2012. The second point in regards to the maintenance, again depending on what this court would do on what she receives, is that she received over $500,000 in liquid assets. And the court would be able to take into consideration that it would be income that she would earn from that. Amounting to approximately 6% would be almost $30,000 a year. Really? Where is she investing? Again, I think if you look at what has happened in this account that they even had, that there was monies that was earned. Now, I would say there has been obviously investments that have made that, made less, made more. But we think even whatever it would be, the court would be able to take that into consideration. So we would be asking that the court consider, reconsider, look at what the judge bases the decision on. The third issue has to do just with the division of the Maryland State. This is sort of a unique situation, I believe. We have had testimony at the trial level from Dr. Brody. And she was a doctor that treated Mr. Cram after his surgery and after the malpractice case back in 2002. There is no question that he has permanent injury. We had asked the court, knowing that that's a, agreeing that that's a marital asset, and this would be the account that was invested with slavery, requested consideration and make an equitable division of that, considering his permanency, considering the fact that he may have need for that additional monies for the possibility of future surgery. In the Napolese brief, it's mentioned that Dr. Brody stated that Mr. Cram would not be a good candidate for a corneal transplant. We would agree with that, but she also addressed, and we addressed that in the brief, that there is another procedure that he may have to be, or have in the future. So he has, we asked at the trial level that he be awarded a proportion of the account that was invested with slavery. Also, I think this is somewhat unique, in the fact that that account was the result of a jury verdict. And in that verdict, Mrs. Cram was awarded $15,000 for loss of consortium, and Mr. Cram's gross award was $557,000. But it was, you know, he was granted $150,000 for normal life, $100,000 for pain and suffering, and then $7,500 for medical expenses. And then he was awarded $300,000 for past and future loss of income. We think, if nothing else, the court could have considered the $300,000 and make a division of that. We've alluded to, in the brief, his life expectancy, and there would be an additional amount of monies that she would receive out of that account, plus what we proposed in the summation that we submitted to the court. So those are basically the three areas, two areas, that we're asking the court to review, and we believe that the trial judge, Judge Drummond, in this case, is, in fact, his discretion. And I think if you look at the figures in regards to the support, the maintenance, 50% of his income would have been paid. What we had asked for in the trial court is a reduction of that, which would, in fact, result in $21,000. The other issue is there was an award of an account that he had of $50,000, and he was given that account. But the court, in rendering its decision in October, did not give him any credit for the amount of monies that he paid to her out of that account for maintenance. This was a farm account. The deposits into that account were monies that he had earned after the parting separation, and it went through October. So there was about $18,000 that she would have been paid out of his income. But then when we got to a division of the estate, Judge Drummond used the $50,000 and did not give him any credit for the $18,000 that he would have had to, or not had to, but in fact had paid her. So, again, we're asking for the relief in regards to the amount of maintenance and the division of the estate. Does the court have any other questions? I see none, so thank you, Counsel. Mr. Heck? Thank you. May it please the Court, Mr. Shearing? Gentlemen, Mr. Justice, we are here really because that's the right of the parties to be here. Because what?  That's right. We've taken the appeal. With all respect, Mr. Shearing, I don't see anything to bring us before this Court. Obviously, he starts by his argument of saying, well, I want to argue the motion to strike. The timeliness of it, the matters pointed in that, I believe, are a matter of law. Mr. Justice Stegman has already said that will be considered. I understand that. But the issue presented in the appellant's appeal is, one, whether the circuit court's award of $3,000 per month maintenance for three years was proper. We believe it wasn't proper. We believe it should have been longer. But that's why we are here. The situation is... Well, you don't expect us to come out with that decision, do you? To be honest, no. Okay. But I think I can make that argument in light of what he has said. He meaning Mr. Shearing. But I'm not going to go any farther with that. Okay. There are two things that I think are important. And the elephant in the room has been completely ignored, or tried to be ignored, not only in the brief but also in the argument. $2 million in non-marital property. That's what Mr. Cram has. Now, Mr. Cram, through his attorney at the time of the trial, Mr. Cram, through his attorney today, he is arguing this deficiency of income, this diminution of income. Because, first of all, he can't work. He's been hurt by this injury, this medical mal. None of that is... His injury is supported by the record. His income has not dropped at all. He's doing the same things that he did before, except for the spraying. He's doing exactly what he did before. He is making the same money. And he is... And I'm not faulting him for this. But he has, as pointed out by Mr. Shearing's expert at trial, Adam, that he is able to manipulate income. Now, he's doing no more or no less than most farmers or any respectable businessman can and will do. But he is not... He's not making money because he chooses to do what he can do legally. He is still making $72,000 a year, even by taking all advantages. Again, do I fault him? In some ways, I admire him because he can do it. But still, my client is making about, say, 10 to 11, 12 percent of that money at the time of trial. That's what she's making. She's making $7,000. Now, the argument throughout this thing, trial and even the argument today is, first of all, that... And Mr. Shearing had said that, but first of all, he says that the reason that we are here is primarily because this guy can't afford it. Well, they have lived a very, very frugal life. At the same time, a very, very good life. I doubt if there are many people in this country that have $2 million worth of property that is debt-free. I doubt if there are too many people in this country that has debt-free living. But then I think you have to look at the other side of the coin. This man has $2 million worth of property. Let's say he can't farm it. Let's say he doesn't want to sell it. What about leasing that out? I mean, none of this has ever been brought up. But still, I think when he said he doesn't have money because he can't farm, first of all, he does farm. That hasn't stopped it all. Secondly, because he does farm, he's got substantial income that my client didn't have. And thirdly, even if he doesn't farm, he's going to have substantial income from the acreage. He's always farmed the land. He continued to farm the land. He's lost nothing. The only thing he has lost is now he's losing this money that he does not want to pay. A review of this record will show that he has squeezed that nickel about as hard as he can squeeze it. Now he wants to squeeze it away from his wife. What's your response to the argument about the $50,000? The argument about the $50,000, Your Honor, is that that $50,000 was taken into account by Judge Drummond. That was all in the mix. It wasn't a hidden account. It wasn't a matter of money that he was not aware of. That $50,000 in that account was considered by Judge Drummond. And in order to, by abundance of record or abundance of case law, in order to overset that, overturn that, I think you've got to find that that is no reasonable man could reach some other conclusion. This is a conclusion Judge Drummond reached after hearing all of the evidence. I think that is equally important in this is not only what Mr. Cram has over here. We have a woman that is now going on 50 years of age, in her 50s. She gave up her livelihood, if you will, when she got married. She gave up her school teaching. She gave up her career. She was a stay-at-home mother shortly after they got married. And she stayed there. And she worked on the farm. And she did her duties not only as a farm wife but as a farm worker, helping her husband, as most farm people do. She is now in a position where she is the age that she's in. We certainly don't live in a bubble. We certainly don't live in a situation where we can't realize in this day and age a 50-year-old woman starting out is not going to get the consideration of a 20-year-old, 23-year-old young woman or man applying for the same position. As far as the statement about the income is concerned, the income I think was inflated not only at trial but also in the argument today in the brief. I would like to make 6%. I would like to make 6% in the last 10 years. I think that if you're making 1%, you'd better be happy. And even that will be a minimal amount. As far as lifestyle, all of the matters that are set forth in the brief and under the law, under the citations concerning maintenance as well as those citations concerning the issue of the division of the property, state that Judge Drummond made no mistake in this case. If he made a mistake, I'm not going back there. I think there should have been a stronger argument for permanent maintenance. But that's behind us. What I'm saying is that based upon all the facts, all the guidelines of the statute and the facts in this case, he made no mistake. We still have a situation where my client, the appellee, did not attempt to take away any of his farm machinery, realize that he had to have the farm machinery and all of that to generate income. But even if he stopped, even if he stopped farming, he could still sell that equipment. Little as it is, farm equipment is worth a lot of money. Only because at the other end the new equipment is so high, it makes the other basis high in the used equipment. It's there. He has the money. Another thing that is overlooked, I think, is the fact that they put three kids through college, two children that my client was not legally responsible for, and their daughter. But what I'm saying there is that's money that was used that will never have to be used again. They're gone. They're out of college. They all are gone. So that's even more money that is available in this pool of money that Mr. Cram has got. As far as the 60-40 split is concerned, the 60-40 split, I think, goes right back to what I've already argued and the mandates, if you will, of the statute. What is said here is, well, he made a mistake, meaning Judge Drummond, that he made this mistake because when he gave this, he erred in the distribution of the property. I don't know how that can be basically said with a straight face. I mean, I know why we are here. But 60-40, when you've got $2 million over here, which is four times what she got, and she had a very limited non-marital estate. He, in fact, had a very large non-marital estate. When you look at that, when you look at the division of property, the length of the marriage, the 22-year marriage, when you look at the health and the demeanor of everybody, now Mr. Schering comes back to the fact, well, look at Mr. Cram. He's so unhealthy. Common sense tells you if you're unhealthy, you go to the doctor. He hadn't been to the doctor in four years. He hadn't been to the doctor in four years. It's just supported by the record and cited in the bill. He didn't go there. Mr. Schering keeps throwing up. Why do you think that's so? Why do I think it's so? Yes. What I think doesn't make a difference. I think it's just too tight. I think it's just too tight. That's what I think. That's pretty tight. That is pretty tight. But all I'm saying is that Judge Drummond had the ability of judging, and the demeanor of the witnesses and their truthfulness of weight, we all know that. So the reality of it is that when you're looking at this in the overall picture, that it's just not supported by fact. So I keep going on. I think we all know where, not where this is going. Obviously, that's in your hands. But the facts are as they are. The law is as it is. The only other thing that I would really want to touch upon as far as this distribution of property is concerned, that on page 17 of Mr. Shearing's brief or Kevin's brief, he states that he, quote, does not disagree that Tammy is entitled to her, quote, just proportion, close quote, of the estate. He just didn't think that 60-40 was the just proportion. Again, what he thinks, what I think, really is not that important to why we're here. Judge Drummond has heard the evidence. Judge Drummond has ruled as far as the overall facts, demeanor, and law in this case, and there's nothing in here that says that any of this is against the manifest way of the evidence or that he erred as a matter of abusing his discretion. I ask the Court to affirm Judge Drummond. Thank you, counsel. You're welcome, John. Okay. Mr. Shearing? Your Honor, first of all, in regards to him not going to the doctor, I think there's no question he has lost sight of his left eye. It's 20 by 400, and that's something that cannot be cured. Is the head correct that the record shows for the last four years he hasn't been to a physician? No. I mean, he's been to a physician. He's not had actually any treatment to that eye other than receiving drops and things of that sort. So he has had no need to go back, nothing they could do, and even though his eyesight now is 20 by 400, that condition has remained the same. It's not improved. He's not getting his eyesight back. In fact, there's a deposition of a doctor that was involved in the malpractice case when it was first filed in, I believe, 2001 or 2002, which is part of the record that identifies what his vision was. In fact, it has progressively gotten worse. So there's really been no need for him to go back for any treatment for that or the other surgery that was requested by Dr. Brody. The other thing is in regards to the manipulation of income, there's nothing in the record that would show that he in any way manipulated his income. In fact, Mr. Kessler testified that of the farm accounts that he had dealt with over the years, that Mr. Grant was a very honest farmer, reported all of his income, that there was an issue made about buying seed and fertilizer in December to get a discount. That is a practice that he followed throughout his farming history. So there has not been any manipulation of income. In fact, if you look at the comparison that Mr. Kessler did, he had good years when he farmed and some bad years. We've come up with an average of what his average income would have been over those five years. The other thing, in regards to the college expenses, there's no evidence in the record as to what money was paid for his two daughters to go to college. I can't even tell the court what that cost or who paid for it, if it was scholarships or loans. There is testimony that he did pay $24,000 over a period of time to pay for their daughter to go to college. He is a very frugal man. The record will also show that when the party separated in October of 2001, I believe, that he moved out of the residence. He moved into a one-room residence that he fixed up. He had a bed and he stayed there for months. The $2 million I would like to address, that in fact is farmland. That is an estate. It's still going on. His uncle died during the course of the... What do you mean it's still going on? The estate is still open. That was evidence that was presented. He received this through a trust. Or is there a dispute that he's going to inevitably end up with the 240 acres? We don't know that. That is not... There has been some pleadings, and again, it's not part of the record, but nothing had been decided as of yet. That estate is still open. Well... More likely than not, I would say he's going to receive... Has the trial court considered that he was going to ultimately end up with, I guess, a fee simple on the ground? That's a fair statement, isn't it? At some point in time, I don't think there was any evidence of support that that definitely would happen. There was an ex-wife or a widow. There were two children. There's litigation going on. We had Sam Tucker, who was the attorney in Carthage, that is handling the estate, testified in regards to Mr. Cram's interest in that. And this was the same farmland that he had been farming throughout much of their marriage. He was cash-renting it at that time. Oh, was he paying the cash rent? $27,000 a year. That would be for his uncle's farm. Was that 240 acres? Yes. Tellable? No, not tellable. When was the last time he paid cash rent? He paid that... There was an issue of that. He paid that throughout in the first year of the divorce, so in 2011, I believe. Honestly, it's not part of the record. I don't know what has been done after that. Time's up. Thank you, counsel. We'll take this matter under advisement.